## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

ALICE COFFEE, LLC,             )
a Michigan Limited Liability Company,   )
                                 )
       Plaintiff,           )
                                 )
vs.                            )     Case No.
                                 )
DEAN G. ROTCHIN, an individual,     )
                                 )
       Defendant.        )

## COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff, Alice Coffee, LLC ("Alice"), for its Complaint against Defendant, Dean G. Rotchin ("Rotchin"), hereby alleges, directly as to its own actions and on information and belief as to all other matters, as follows:

## INTRODUCTION

1.    This case is about Rotchin's brazen theft of Alice's business relationships and opportunities, his breaches of his fiduciary duties and other obligations to Alice, his trade secret and other theft, and his other ongoing malicious wrongdoing.

2.    Alice is a small, local family-owned start-up business funded by Peter Krupp ("Krupp").  Alice is working to bring to market a novel, patent-pending, eco-friendly soft coffee pod to replace the use of plastic K-Cups in single-serve coffee machines.

3.    Rotchin was the lead operating manager of Alice—its most senior executive and *de facto* Chief Executive Officer ("CEO")—from January 2017 until he was terminated for cause in December 2020.  Alice employed Rotchin to run all aspects of its business, including its marketing, product research and development, supplier procurement, and funding efforts.  Alice paid Rotchin

$8,000 a month, a total of more than $360,000 before he was fired.  Alice also offered Rotchin a potential ownership stake in the company.

4.      In a stunning betrayal, while still employed by Alice and continuing after his termination, Rotchin actively worked to destroy and steal Alice's business and assets, including its patent-pending soft fabric coffee pod product.

5.      In particular, Rotchin used Alice's trade secrets and confidential business information while still employed by Alice to steal Alice's specialty fabric vendor and business partner, "Alice Partner 1," the identity of whom is well-known to Rotchin and understood to be confidential business information of Alice.  After years of working together, Alice Partner 1 and Alice were in the process of formalizing a long-term exclusive supply partnership at the time Rotchin secretly misappropriated this business opportunity for himself and "Newco," a company he formed to compete with Alice and steal its business and assets.

6.      Specifically, during an October 23, 2020 call between Rotchin, Krupp, and the CEO and President of Alice Partner 1, Rotchin promised to send an agreement that would formalize the long-term partnership between Alice and Alice Partner 1.

7.      Rotchin never sent Alice Partner 1 the promised agreement with Alice.  Instead, without resigning from Alice, Rotchin fraudulently told the CEO of Alice Partner 1 that Alice had decided to exit the soft coffee pod business to trick this critical Alice vendor into signing an exclusive supply agreement with Rotchin and Newco rather than Alice.  Through his fraud and in clear violation of his obligations to Alice, Rotchin stole this extremely valuable Alice business relationship for himself.

8.      After learning of Rotchin's malfeasance in early December 2020, Alice immediately contacted Rotchin seeking to cure his breaches of fiduciary duty and other violations.

9.      In response, Rotchin did not deny his theft of the Alice Partner 1 business.  To the contrary, Rotchin and his counsel warned Alice against interfering with Rotchin's fraudulently procured agreement with Alice Partner 1.  Rotchin and his counsel also improperly attempted to revoke Rotchin's lawful and binding assignment of his rights in and to Alice's soft coffee pod patent application.

10.      Because of Rotchin's unlawful and unethical actions, Alice terminated Rotchin, and its offer of Alice options, for cause.

11.      Despite Alice's request, Rotchin refuses to stop his unlawful interference with Alice's business and theft of Alice assets.  For example, Rotchin refuses to stop using and return any of the voluminous Alice confidential business information and trade secrets in his possession, including materials that Rotchin himself designated as "Proprietary and Confidential, all rights reserved Alice Coffee, LLC," and other materials Rotchin had staunchly protected as confidential and valuable Alice assets during his tenure with Alice.

12.      Alice also recently learned that Rotchin is tortiously attempting to poach a critical Alice consultant that Rotchin himself signed to a nondisclosure and non-compete agreement with Alice.

13.      Alice brings this action to remedy Rotchin's willful and malicious violations of his legal obligations to Alice.  Alice also seeks a declaration that Rotchin's assignment of his rights in and to Alice's pending patent application is valid and binding on Rotchin.

## THE PARTIES

14.      Plaintiff, Alice, is a Michigan Limited Liability Company headquartered in West Olive, Michigan.

15.     Defendant, Rotchin, is a Canadian citizen currently residing at 2797 Fawn Drive, Loxahatchee, Florida.

16.     Newco is believed to be a newly formed legal entity owned, controlled, and operated by Rotchin, and likely others.  Rotchin founded Newco while he was employed by Alice to compete with Alice and steal Alice's business relationships and opportunities, its confidential business information and trade secrets, and its pending patent application.  Alice plans to name Newco as a defendant in this lawsuit once its legal identity is known to Alice.

## JURISDICTION AND VENUE

17.     This action is based upon (1) common law and statutory breach of the fiduciary duties of loyalty and care; (2) common law and statutory breach of the corporate opportunity doctrine; (3) the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*.; (4) the Michigan Uniform Trade Secrets Act, MCL § 445.1901, *et seq.*; (5) tortious interference with business relationship and economic expectancy; (6) unjust enrichment; and (7) conversion.

18.     Alice also seeks a declaration that Rotchin's assignment of his rights in and to the Alice patent application and the inventions contained therein is valid and binding on Rotchin.

19.     This Court has original jurisdiction over this action pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836(c) and 28 U.S.C. § 1331.  This Court has supplemental jurisdiction over the other claims asserted herein pursuant to 28 U.S.C. § 1367.  This action is also subject to the Court's diversity jurisdiction under 28 U.S.C. § 1332 because there is complete diversity and the amount in controversy exceeds the jurisdictional amount.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 2201 & 2202 over Alice's request for declaratory relief, which presents an actual case and controversy.

20.     This Court has personal jurisdiction over Rotchin, and venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claims pled herein occurred in this District and a substantial part of the property that is the subject of the claims is situated in this District.

21.     Alice is headquartered in West Olive, Michigan and has workspace in Grand Rapids, Michigan.  Rotchin has traveled to and stayed in this District to conduct and supervise business for Alice.  All of Alice's employees reside in this District and Rotchin engaged in frequent telephone and email correspondence directing the work of these Alice employees in this District.

## FACTUAL ALLEGATIONS

### A. Alice Coffee

22.     Alice is a small local start-up business founded by Krupp.  Krupp has provided 100% of the funding for Alice.  Alice currently has three employees.

23.     An Alice affiliate originally developed a business plan to sell subscriptions over the Internet for roasted coffee beans and traditional plastic K-Cups filled with specialty coffee under the Alice brand.

24.     Alice's current main product is a patent-pending fabric coffee pod that is capable of being used in a variety of single-serve coffee machines, including those sold by market leaders Keurig and Nespresso.  Alice was formed in August 2017 to focus on the development of the Alice soft coffee pod business.  Despite Rotchin's theft and betrayal, Alice plans to begin offering its soft coffee pod product during 2021.

### B.  Alice Hires Rotchin As Its *De Facto* CEO To Run The Company

25.     Krupp knew Rotchin through a seed investment he made in Rotchin's private jet "charter by the seat" start-ups, the last of which, BlackJet Technology, Inc., ceased operations in May of 2016.

26.     As founder and CEO of these and other start-ups, Rotchin led all aspects of their funding activities, business and product development, supplier relations, and marketing of their subscription-based product.

27.     Rotchin is an experienced senior executive.  As such, Rotchin is well versed in the strict fiduciary and confidentiality obligations owed by executives to the companies that employ them.

28.     Krupp believed that Rotchin's experience as a CEO with start-up businesses, including his experience with fund raising and marketing of a subscription-based product, would benefit Alice.  Krupp therefore offered Rotchin a senior executive position with the Alice group in late-2016 after BlackJet failed.

29.     Rotchin accepted Krupp's offer and began working for an affiliate of Alice in January 2017.  Rotchin was initially tasked to supervise and further develop Alice's existing business plan to sell subscriptions for traditional plastic K-Cups filled with specialty coffee under the Alice brand.

30.     Rotchin's compensation for his employment by Alice as its manager and *de facto* CEO was $8,000 per month.  Alice also offered Rotchin the potential for an ownership stake in the company that was to be finalized when Alice began to sell products or was about to secure financing, neither of which has yet occurred.

31.     Prior to his termination for cause in December 2020, Alice paid Rotchin over $360,000.  Rotchin also knew that Alice had retained outside counsel to document its offer to Rotchin of an Alice ownership stake.

### C.  Rotchin's Responsibilities And Duties To Alice

32.     At all times until his discharge, Rotchin served as Alice's most senior executive and *de facto* CEO.  Rotchin held himself out as the manager of Alice.  Rotchin told third parties that he was "running a start up in the coffee business."

33.     Rotchin was responsible for setting up Alice's business operations and for the daily management of Alice.  Rotchin supervised a very small team of Alice employees in connection with Alice's marketing, product research and development, vendor, supplier and consultant procurement, and funding efforts.

34.     As the most senior executive of Alice, Rotchin owed strict fiduciary duties to Alice, including the duty of loyalty and the duty of care.  An experienced senior executive and CEO, Rotchin was well-aware of and agreed with the fiduciary duties he owed to Alice.

35.     Among other things, Rotchin knew that he was not allowed to take advantage of the knowledge he acquired of Alice's business to make a profit for himself at Alice's expense. Rotchin also knew that he was required to discharge his duties to Alice in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner that he reasonably believed to be in the best interests of Alice.

36.     Rotchin was also well-aware of the corporate opportunity doctrine, which precludes company executives from diverting company business opportunities for their own personal gain. Rotchin knew that it was a breach of his fiduciary duties to Alice to divert any business opportunities of Alice for his own personal gain.

**D.  Alice's Protection Of Its Confidential Business Information And Trade Secrets**

37.    Rotchin spearheaded and was intimately involved in the development of Alice's confidential business information and trade secrets, and he understood the importance of strictly protecting these valuable Alice assets.

38.    As the senior executive in charge of and responsible for Alice's daily operations, Rotchin was responsible for implementing appropriate measures to protect Alice's confidential business information and trade secrets.

39.    Rotchin understood that his failure to protect Alice's confidential business information and trade secrets would harm Alice and violate his fiduciary obligations to Alice. Rotchin therefore took numerous actions to satisfy his duties and protect Alice's confidential business information and trade secrets.

40.    For example, Rotchin labelled presentations "Proprietary and Confidential, all rights reserved Alice Coffee, LLC."  Rotchin also instructed Alice employees on the importance of protecting Alice's confidential business information and trade secrets.  In addition, confidential information and trade secrets were not widely shared within Alice, and Alice employees were only involved in confidential business matters on a need-to-know basis.

41.    Rotchin also drafted what he termed the "Alice Standard Non-Disclosure, Non-Circumvention and Non-Competition Agreement" (the "Alice Standard NDA and Non-Compete Agreement").  Rotchin based the Alice Standard NDA and Non-Compete Agreement on a similar agreement he used in his jet charter business.  The Alice Standard NDA and Non-Compete strictly safeguards Alice's confidential business and trade secret information.

42.    The Alice Standard NDA and Non-Compete Agreement provides for a five-year term and it broadly defines "Confidential Information."  Third-party signatories are required to

strictly protect the confidentiality of Alice's Confidential Information and they are narrowly constrained in their ability to share such information with their employees and others.

43.    The Alice Standard NDA and Non-Compete Agreement also includes a non-competition obligation which strictly forbids third-party signatories from using Alice's Confidential Information to compete with Alice.  It also includes a non-circumvention provision which precludes third-party signatories from dealing with others for the purpose of avoiding obligations to Alice.

44.    Rotchin was Alice's principal liaison with Alice's potential third-party vendors, suppliers, partners, and consultants.  On behalf of Alice and consistent with his duties to Alice, Rotchin required all third parties to keep their conversations confidential and to sign a confidentiality and non-compete agreement—typically the Alice Standard NDA and Non-Compete Agreement—before entering detailed discussions involving Alice's confidential information and trade secrets.

45.    Rotchin, on behalf of Alice, also instructed Alice employees that third parties were required to sign the Alice Standard NDA and Non-Compete Agreement, or a similarly protective agreement, before disclosing any of Alice's confidential information and trade secrets.

### E.  The Alice Soft Coffee Pod

46.    From early 2016 through the summer of 2017, the Alice group's efforts, under Rotchin's direction beginning in January 2017, were focused on finalizing the Alice group's e-commerce website in order sell subscriptions for roasted coffee beans and traditional K-Cups.

47.    In the summer of 2017, Krupp determined that the cost of shipping traditional K-Cups was too high for Alice's business model.  To solve the shipping cost problem, Krupp directed

Rotchin to experiment with the idea of a soft fabric single-serve coffee pod that would work in Keurig machines and shipped in a cost-saving "flat pack" envelopes.

48.     Alice's resultant novel soft coffee pod product required that Alice undertake extensive research, design, development, manufacturing, and marketing efforts.  Rotchin was responsible for and supervised Alice's efforts in this regard.

49.     Among other things, Rotchin's responsibilities included working with third party vendors, suppliers, partners, and consultants (a) to develop the specifications and sources for the fabric to be used to make the soft coffee pods, (b) to source and develop the closing mechanism to be used to make the soft coffee pods, (c) to source, design and construct the custom machinery needed to manufacture the soft coffee pods, and (d) to source and develop appropriate product packaging and shipping.

### F.  Alice Protects Its Trade Secrets And Confidential Business Information

50.     Alice's business development efforts resulted in the creation of extensive valuable confidential information and trade secrets owned by Alice.  Rotchin supervised and was centrally involved in the creation of these valuable Alice assets.

51.     Alice's confidential business information and trade secrets included, among other things, the identity and qualifications of its potential business partners for the design and fabrication of the Alice soft coffee pods and the custom soft pod manufacturing machines.

52.     Alice also developed extensive scientific written materials related to the environmental effects of the use of traditional K-Cups versus Alice's soft coffee pods.

53.     Alice took reasonable steps to keep all its proprietary information confidential.

54.     As noted, Rotchin was responsible for ensuring that all of Alice's third-party vendors, suppliers, partners, and consultants executed appropriate nondisclosure agreements

("NDAs") to protect Alice's valuable confidential business information and trade secrets.  Rotchin understood and agreed with his obligations in this regard, and he made sure that all third parties provided with any confidential Alice information executed appropriate NDAs, typically the Alice Standard NDA and Non-Compete Agreement.

55.     As the executive in charge of Alice's operations, Rotchin instructed Alice's employees to undertake similar precautions to the extent they dealt with third parties.

### G.  <u>The Alice Patent Application</u>

56.     Alice's soft coffee pod business development efforts also resulted in the creation of patentable inventions.  Unlike K-Cups, Alice's novel fabric coffee pods are compostable, they can be used with any single serve beverage machine, and they can be manufactured, packaged, and shipped at significantly reduced cost.

57.     Rotchin supervised Alice's patent procurement efforts.  As part of these efforts, Rotchin advised in December 2017 that, consistent with standard industry practice, he believed the Alice inventors should "immediately assign" their "rights in the application" to Alice.

58.     Alice retained patent counsel recommended by Rotchin.  On March 1, 2019, Alice filed a patent application directed to its novel fabric coffee pod with the Patent & Trademark Office ("PTO").  Prosecution of the patent application is ongoing.

59.     Rotchin, Krupp, and David Hansen are the named inventors on the Alice patent application.  Before the application was filed, the named inventors discussed who should be listed as inventors on the Alice patent application.  Rotchin agreed that the three individuals named on the application as filed are the only inventors of the inventions described in the Alice patent application.

60.     After the application was filed, and consistent with Rotchin's December 2017 instruction, Alice's patent counsel recommended that the Alice inventors assign to Alice all their rights in and to the Alice patent application and the inventions contained therein.   Rotchin supervised outside patent counsel's efforts to obtain these inventor assignment agreements.

61.     At Rotchin's urging, each of the inventors executed identical assignments of their rights in and to the Alice patent application.  The assignments were filed with the PTO on February 17, 2020.

62.     The assignments provide that each inventor assigned their "entire right, title and interest in and to" all of the inventions contained in the Alice patent application, including "all divisions, reissues, continuations and extensions" of the application.  Each inventor also expressly acknowledged that their assignment was being made "[i]n consideration of the premises hereof, and other good and valuable consideration, receipt of which is acknowledged[.]"

63.     None of the inventors, including Rotchin, objected to the assignment or indicated that their assignment was contingent on consideration not already received at the time of the assignment.  In fact, the assignments expressly state to the contrary.  The assignments also do not indicate or suggest that the inventors were owed any additional consideration.  The assignments were in fact supported by adequate consideration.

**H.  Alice's Confidential Relationship And Business Agreement With Alice Partner 1**

64.     A core aspect of Alice's confidential product development and go-to-market strategy concerns the specification and source for the specialized fabric that will be used with Alice's novel soft coffee pods.  Rotchin and the small Alice team he supervised were paid to work on this project for over three years.

65.     As a result of these efforts, Rotchin reported to Krupp in January 2019 that Alice had "NDA's with non-compete lingo with six US-based producers of the fabric we intend to use." Although Rotchin was not specific in his email, Alice believes that the "NDA's with non-compete lingo" executed by the six fabric producers was the Alice Standard NDA and Non-Compete Agreement, which Rotchin generally required third parties to sign, or an equally protective agreement.  In addition, although Rotchin did not specifically name the six U.S.-based fabric producers which had signed an "NDA with non-compete lingo" with Alice, Alice believes that Alice Partner 1 was one of the six.

66.     In this same email, Rotchin reported that he was "working closely" with one of the fabric producers, believed to be Alice Partner 1, and he stated that they have been "terrific." Rotchin detailed Alice Partner 1's history, experience, capacity and general cost structure, and he noted that "[t]hey love what we are doing, they have every food safety cert available and want to help us in any way they can."

67.     Rotchin remained impressed with Alice Partner 1 and he continued to work closely in strict confidence, on Alice's behalf, with the CEO and the President of Alice Partner 1 throughout 2019 and 2020.

68.     Because of the strength of the relationship that developed between Alice and Alice Partner 1, the pod manufacturing machine being custom designed for Alice was specifically engineered to incorporate the specialty fabric Alice planned to purchase from Alice Partner 1.

69.     On February 17, 2020, Rotchin sent an email to the CEO of Alice Partner 1 stating that Alice wanted to place a fabric order but it was "taking time, due to the requirement for production machinery to produce the pods."  Rotchin assured the CEO that Alice was working hard to complete the design of the machine to manufacture the Alice soft coffee pods.  Rotchin

13

also assured the CEO that Alice Partner 1 was Alice's "choice for supplying" the specialty fabric for Alice's soft coffee pods and that Alice was "happy to enter into a supplier agreement with [Alice Partner 1]."

70.     Rotchin sent a follow-up email to the CEO of Alice Partner 1 on April 10, 2020, reporting that Alice was "still grinding away … working on a production machine."  The CEO responded on April 11, 2020, confirming that Alice Partner 1 was "ready to go" whenever Alice was.

71.     On July 16, 2020, Rotchin told the CEO of Alice Partner 1 that Alice was "in the process of ordering a machine to produce the PODS!"  Rotchin explained that it would take some time because "it is a custom machine with some 'inventing,' but we are out of the gate!"  Rotchin reported that Alice was "going to ramp up the company soon" and "begin building commercial assets and start marketing."

72.     In this same July 16 email, Rotchin told the CEO of Alice Partner 1 that Alice "would like to enter into an exclusive supplier relationship agreement with" Alice Partner 1. Rotchin stated that his "idea is, [Alice Partner 1 will] be [the] exclusive supplier of this fabric to [Alice], and you'll not supply it to a direct competitor."  Rotchin stated that if Alice Partner 1 was "amenable" he would "get the paperwork started."

73.     The CEO of Alice Partner 1 responded the next day, July 17, 2020, stating that Alice's progress toward commercialization was "great news."  He acknowledged that Alice and Alice Partner 1 had "come a long way together" and that Alice Partner 1 was "looking forward to the continuation of a great relationship."

74.     The CEO also affirmed that Alice Partner 1 "would greatly appreciate being [Alice's] exclusive manufacturer" and he "guarantee[d]" that Alice Partner 1's relationship with

Alice "will be a top priority." He also "guarantee[d]" that the relationship between Alice and Alice Partner 1 would have "total confidentiality."

75.     In this email, the CEO provided some specific information and preparations that Alice Partner 1 would need to supply the specialized fabric to Alice, and he asked Rotchin to "forward the contract to me and I will sign and return it to you." The CEO closed: "Again, thank you very much for this opportunity. We're looking forward to a long-term relationship" with Alice.

76.     On July 24, 2020, Rotchin emailed the CEO of Alice Partner 1 regarding the "Agreement," explaining that he was "delayed on paperwork" and that he would send the agreement "when I get it back from my partner. Rest assured, it's getting done."

77.     In truth, Rotchin had not yet provided a draft agreement to his "partner," Krupp.

78.     It was not until a month later, on August 20, 2020, that Rotchin finally forwarded Krupp a "first draft" of the exclusive supply agreement between Alice and Alice Partner 1.

79.     Krupp revised the draft agreement and he had discussions with Rotchin concerning the agreement. At Krupp's request, Rotchin arranged a call with the CEO and the President of Alice Partner 1 to discuss finalizing the agreement and other details of the planned long-term relationship between Alice and Alice Partner 1.

80.     That call took place on October 23, 2020. During the call Rotchin, Krupp, and the CEO and the President of Alice Partner 1 discussed details concerning their companies' exclusive relationship, including production plans and manufacturing and supply details. At Krupp's request, the CEO agreed to send Alice additional samples of the specialty fabric Alice Partner 1 had prepared for Alice that would help Alice's soft coffee pod machine designer and manufacturer with the custom design and engineering of the Alice soft pod manufacturing machines.

81.     Because Alice anticipated that it would finally be able to begin commercial production of the soft coffee pods and would need a large quantity of specialty fabric from Alice Partner 1, the parties agreed during the October 23 call that they would work to reach a final agreement within weeks.

82.     Rotchin told the CEO and the President of Alice Partner 1 that he expected to promptly distribute a draft of the supply agreement to memorialize the terms of what the parties characterized as a long-term exclusive business partnership between Alice and Alice Partner 1.

83.     Rotchin's promise during the October 23 call was false. Alice now believes it is very likely that Rotchin had already determined to steal Alice's business for himself and he knew that a long-term exclusive supply partnership between Alice and Alice Partner 1 would thwart his plan to steal Alice's business for himself.  To further his betrayal and theft, Rotchin therefore never sent Alice Partner 1 the promised agreement with Alice.

84.     Instead of sending Alice Partner 1 the exclusive supplier agreement between Alice and Alice Partner 1 as he promised, Rotchin secretly founded Newco and stole the Alice Partner 1 business for himself.

### I.   Rotchin's Breach Of His Duties To Alice And Alice's Discovery Of His Theft

85.     Alice only inadvertently learned of Rotchin's betrayal and theft.

86.     Krupp called Alice Partner 1's CEO on December 3, 2020 after he was unable to get an answer from Rotchin regarding the specialty fabric samples he requested during the October 23 call.  The CEO expressed surprise that he was hearing from Alice because Rotchin had told him that "Alice was no longer pursuing the soft coffee pod business" and that Alice Partner 1 "should delete all references to Alice from its system."  The CEO also told Krupp that Rotchin had stated that he and Newco "would be pursuing the soft coffee pod business" instead of Alice.

87.     Krupp assured the CEO of Alice Partner 1 that Alice was still vigorously pursuing its soft coffee pod business and that Rotchin's statements to the contrary were simply untrue. Krupp also stated that Rotchin still worked for Alice.

88.     The CEO of Alice Partner 1 told Krupp that, in hindsight, he thought Rotchin's actions were odd.  The CEO told Krupp that Rotchin had pushed him to sign an exclusive supply agreement with Newco before Thanksgiving.  The CEO was surprised that Rotchin was suddenly in a rush to sign up an agreement after taking months to get him a draft.  He also told Krupp that Rotchin had conceded issues quickly, including a "most favored nations clause" that Rotchin dropped without a fight when the CEO objected.

89.     The CEO told Krupp that he signed an agreement between Alice Partner 1 and Rotchin and Newco on November 27, 2020 (the Friday after Thanksgiving), but that Rotchin still owed him a check for $25,000.

90.     Krupp told the CEO of Alice Partner 1 that Rotchin was employed by Alice and the agreement should be between Alice and Alice Partner 1.  That had always been the intent.  The CEO told Krupp that he would need to see if Rotchin "comes up with the money."  The CEO then told Krupp that, if necessary, Alice Partner 1 would terminate the Rotchin/Newco contract "based on fraud."

**J.    Alice Terminates Rotchin, And Its Offer Of Alice Options, For Cause**

91.     On December 7, 2020, Krupp sent Rotchin a letter, on behalf of Alice, attempting to resolve the issues with Rotchin in good faith, hoping that Rotchin's apparent breaches and theft, as related by the CEO of Alice Partner 1, were merely a misunderstanding.

92.     Alice's efforts were unsuccessful, and Alice terminated Rotchin's employment, and its offer of Alice options, for cause.

93.     Rotchin responded to Krupp's letter on December 14, 2020.  Rotchin's newly-retained counsel sent Krupp a letter on Rotchin's behalf on December 15, 2020.

94.     Rotchin and his counsel did not deny that Rotchin stole the Alice Partner 1 business from Alice.  To the contrary, they demanded that Alice "immediately … cease any and all interference with Mr. Rotchin's independent business relationships with [Alice Partner 1] or others[.]"

95.     Rotchin also refused to stop using and return to Alice the voluminous Alice confidential business information and trade secrets in his possession, including materials that Rotchin himself designated as "Proprietary and Confidential, all rights reserved Alice Coffee, LLC" and the other materials that Rotchin had steadfastly protected while he worked for Alice.  In fact, Rotchin's counsel wrongly claimed that these valuable Alice assets had somehow transformed into Rotchin's "own information" after his termination.

96.     To date, Rotchin has not returned a single document to Alice and he is still unlawfully and maliciously using Alice's trade secrets and confidential business information to support Newco in an effort to destroy Alice.

97.     Rotchin and his counsel appear to incorrectly believe that Rotchin's misconduct would be excused if he no longer worked for Alice at the end of October 2020.  Thus, Rotchin claimed in his letter that Alice's "idea that I still worked for [Alice] after the end of October [2020] is self-serving and incorrect[.]"  Parroting Rotchin's claim, his counsel also claimed that "Rotchin ceased work for or further obligation to [Alice] effective October 31, 2020."

98.     Rotchin and his counsel also incorrectly claimed, in a further effort to steal from Alice, that Rotchin's assignment of his patent rights to Alice was "null and void" because Alice failed to "timely convey" Rotchin's potential equity interest in Alice.

99.     Neither of these assertions are true.  Rotchin did not resign from Alice effective October 31, 2020 or otherwise.  Even if he had, he still breached his fiduciary and other obligations to Alice.

100.    Also, Rotchin's patent assignment to Alice is lawful and binding on Rotchin.

## K. **Rotchin Did Not Resign From Alice**

101.    Significantly, Rotchin and his counsel did not state in their letters that Rotchin resigned from Alice before he was terminated for cause in December 2020.  The reason is simple: he did not.

102.     Rotchin's fiduciary duties and other obligations to Alice, as well as basic good faith, fair dealing, ethics, and honesty, obligated Rotchin, the most senior Alice executive and long-time *de facto* CEO, to provide Alice with written notice if he was resigning from Alice.

103.    Prior to his termination for cause in December 2020, Rotchin did not provide Alice with any notice—written or oral—that he had resigned.

104.    If Rotchin had provided Alice with notice that he had resigned, Alice would have been able to timely address Rotchin's resignation with Alice's actual and potential business partners, including Alice Partner 1, and hopefully head off Rotchin's misconduct and theft.

105.    Rotchin's failure to provide proper—or any—notice prevented Alice from learning, prior to December 3, 2020, that Rotchin founded his own company, Newco, to steal Alice's assets in the hope of driving Alice out of business.

106.    Prior to December 3, 2020, because Rotchin did not provide Alice with any notice of his supposed resignation, Alice also was unaware of and unable to counter Rotchin's false and malicious statements to Alice business partners and potential partners, including Alice Partner 1, that Alice was no longer pursuing the soft coffee pod business.

107.     Moreover, far from resigning, Rotchin gave the appearance throughout November 2020 that he was still working for Alice, which, as far as Alice was concerned, he was.  Rotchin's conduct led Krupp and others at Alice to reasonably believe that Rotchin was still employed by Alice.

108.     For example, Rotchin continued to use his Alice email and Alice's internal confidential company website for communications concerning company business during November 2020.

109.     Specifically, on November 2, 2020, Rotchin used his Alice email and the internal Alice Slack website to let the Alice team that reported to him know that the team meeting Rotchin had scheduled for that morning was cancelled.  Rotchin did not tell his Alice team that he had resigned from Alice.  Rather, he simply told the team that he was: "Tied up with something until noon.  Thanks."

110.     Rotchin's Alice team members continued to communicate with Rotchin concerning Alice business during November 2020.  Although Rotchin continued to monitor his Alice emails and the Alice internal website, he never told his Alice team members to stop communicating with him or that he had resigned from Alice.

111.     On November 20, 2020, Rotchin reviewed an email sent to his Alice email by a vendor concerning an outstanding bill that Alice had not yet paid.  Rotchin did not tell the vendor he no longer worked for Alice.  Rather, in his November 21, 2020 response Rotchin told the vendor to send an email to Krupp for payment.  This exchange clearly shows that Rotchin continued to access, monitor and use his Alice email and the Alice confidential internal website before he was terminated for cause in December.

112.    Rotchin also had numerous communications with his "partner" Krupp during November using his Alice email account.  Rotchin never told Krupp that he had resigned from Alice.  To the contrary, on November 3, 2020 Rotchin confirmed that he has "been continuing helping … Alice."  On November 4, 2020, Rotchin told Krupp that, despite differences they were having at the time: "We are partners…."

113.    This is not the conduct or statements of someone who had resigned from and no longer worked for Alice.

114.    Rotchin's reason for not providing Alice with notice that he had supposedly "secretly" resigned from Alice until his theft was discovered in December 2020 is simple: Rotchin wanted to steal as much as he could from Alice, including Alice's relationship with Alice Partner 1, before Alice learned of his theft and acted to stop him.

115.    Rotchin's reason for attempting to backdate his separation from Alice to October 31, 2020 is equally obvious and unavailing: Rotchin's breach of his fiduciary duties and other obligations to Alice, and his theft of Alice's business with Alice Partner 1 (and likely other Alice business partners or prospects) likely began in earnest during November 2020.

116.    Moreover, Rotchin's clear and flagrant violations of his duties and obligations to Alice are not excused even if Rotchin is deemed to have stopped working for Alice at the end of October 2020.

**L.   Alice Never Withdrew Its Offer For An Equity Stake To Rotchin**

117.    In late 2017, Alice offered Rotchin a potential 30% ownership stake in Alice in the form of options that were to be documented once Alice began commercial sales of product or was about to secure financing.

118.    Prior to his termination for cause, Alice never revoked its offer to Rotchin of a potential equity stake in Alice.  Rotchin cannot point to anything to the contrary other than his own false and self-serving claims after he was terminated for cause in December 2020.

119.    Indeed, even in his December 7, 2020 letter, after learning of Rotchin's dishonesty and theft, Krupp reaffirmed Alice's offer of options to Rotchin, contingent at that time on Rotchin ending and remedying his apparent misconduct.  In his response, Rotchin elected to finally reject Alice's ownership offer in favor of continuing his unlawful conduct.

120.    Rotchin had the last clear chance to accept Alice's offer of options and to avoid his termination, for cause, of his employment with Alice and Alice's offer of an ownership interest. Rotchin declined.

121.    Rotchin's claim in his December 14, 2020 letter that Alice "continued to refuse [during October 2020] to issue [Rotchin's] shares" is simply false.

122.    By August 2020, Alice's business had reached the point where Rotchin and Krupp decided that Alice needed to hire a Manager of Information and Online Systems.  Alice's business had finally progressed to the point where it was approaching commercial sale of its soft coffee pod product and potential outside financing.

123.    Rotchin and Krupp decided that the manager would be entitled to a potential grant of Alice stock options.  In the offer letter to their candidate, Krupp and Rotchin stated:

> "We intend to establish an equity option plan for Alice Coffee (the 'Equity Plan). …  As discussed, we will include you in the Equity Plan. The size of your grant will be determined by Dean Rotchin and Peter Krupp within 90 days as the financing plans for Alice are finalized."

The candidate accepted the offer and started working for Alice in September 2020.

124.    Alice retained counsel in October 2020 to document the equity option plan and other corporate legal work.  This counsel had assisted Rotchin in his prior start-up companies. They also had assisted the Krupps with other of their companies.

125.    On October 20, 2020, Krupp emailed Rotchin to let him know that Alice had retained this outside counsel "to help with corporate" and intellectual property work.  Krupp introduced Rotchin to Alice's outside counsel's trademark counsel and suggested that Rotchin follow up concerning some trademark issues Rotchin was working on for Alice.  Rotchin did so.

126.    Later that same day, October 20, 2020, Krupp specifically told Rotchin that he had spoken with a corporate partner of Alice's outside counsel "about starting documentation of the shares."  Krupp stated that he believed the corporate partner would be a "good asset for us [and] I assume you're comfortable with him."

127.    Rotchin provided a one-word response to Krupp a half hour later: "Beautiful." Rotchin's response could not more clearly and unambiguously show Rotchin's agreement with, and approval of, Alice's plan to document the potential ownership interest in Alice by Rotchin and others employed by Alice.

128.    Prior to October 20, 2020, Rotchin suggested various structures for Alice and differing percentage of his share ownership.  Rotchin's proposals show that he had not agreed with or accepted Alice's ownership proposal.

129.     But after the October 20, 2020 email exchange, Alice had no reason to believe that Rotchin was dissatisfied with Alice's progress in documenting the actual ownership proposal Alice had made subject to documenting Alice's stock option plan.

130.    The October 20, 2020 exchange was Krupp and Rotchin's last communication concerning Rotchin's potential Alice ownership interest before Rotchin secretly breached his

duties and obligations to Alice and was fired for cause.  Rotchin undertook his unlawful conduct clearly knowing that Alice was working with outside counsel to document Rotchin's potential equity interest in Alice.

131.    What is clear is that in response to Alice's December 7, 2020 letter, Rotchin elected to walk away from his potential ownership interest in Alice in favor of trying get away with stealing the entirety of Alice's business for himself.

132.    Thus, contrary to the false allegation Rotchin made after he was caught and fired, Alice did not "refuse" to honor its promise of a potential ownership interest.  Rotchin knew before he stole from Alice and was fired for cause that Alice intended to honor its offer concerning ownership.  Rotchin elected to reject his potential ownership interest after he was caught and fired believing that he was better off simply stealing Alice's business for himself.

**M. <u>Rotchin's Assignment Of Patent Rights Is Lawful And Binding</u>**

133.    Rotchin falsely claimed in his December 14, 2020 letter that his assignment of his rights in the Alice patent application "was based on having the shares we agreed upon," and he threatened that he was "formally withdrawing [his] assignment and will have it stricken from the USPTO record."   Again, simply parroting Rotchin's argument, Rotchin's counsel alleged that Rotchin's assignment is "null and void" based on Alice's supposed failure to "timely" document Rotchin's potential ownership interest in Alice.

134.    These claims are untrue and are simply another attempt to further Rotchin's ongoing theft from Alice.

135.    Among other things, Rotchin expressly acknowledged in his assignment that it was supported by "good and valuable consideration, receipt of which is acknowledged."   Rotchin

pushed for all the Alice inventors to assign their rights to Alice, and he never even suggested that any of the assignments, including his own, should be contingent on anything.

136.    At the time he executed his assignment, Rotchin had been paid hundreds of thousands of dollars for his Alice work, including for his work relating to the Alice patent application.  Rotchin did not make his assignment contingent on any additional consideration, including formal documentation of Alice's offer of options.    And as Rotchin expressly acknowledged in the assignment, his assignment was supported by adequate consideration that he already had received.

### N. Rotchin Converted Property Owned By Alice

137.    During his time at Alice, Rotchin paid for items for which he was entitled to reimbursement from Alice.  In each instance where Rotchin submitted expense reports, Alice promptly reimbursed Rotchin for such expenses.  Consistent with standard business practice, Alice did not reimburse Rotchin for supposed business expenses for which he did not request reimbursement.

138.    Alice also issued Rotchin a company credit card for use in connection with his Alice expenses.  All Rotchin's charges to this card were paid by Alice.

139.    Rotchin's last expense report, submitted by Rotchin and paid by Alice in October 2020, reimbursed Rotchin for expenses incurred to purchase for Alice the ZPODS.COM URL (the "Alice URL") and for various trademark design work.

140.    Despite being reimbursed for these expenses, Rotchin improperly continues to maintain ownership of the ZPODS.COM.  Alice also previously reimbursed Rotchin for the purchase of other URLs for Alice, and he has improperly continued to maintain ownership of these URLs, which rightly belong to Alice.

**O.**  **Rotchin's Unlawful Interference With Alice Is Ongoing**

141.    Alice believes that Rotchin's attorney is also outside patent counsel to another company ("Alice Partner 2") that Rotchin had numerous discussions with, on Alice's behalf, concerning a marketing partnership with Alice.

142.    The attorney's demand that Alice "immediately withdraw" Rotchin's patent assignment and confirm "Rotchin's unrestricted right to use as he sees fit all related technology in his independent venture," is another attempt to further Rotchin's ongoing theft from Alice.  Among other things, it would allow Rotchin to license or assign his rights in the Alice patent application, free of obligations to Alice, to Alice Partner 2.

143.    Alice recently attempted to contact Alice Partner 2 but it has received no response. Rotchin presumably is in the process of misappropriating or has already misappropriated this Alice business opportunity for himself.

144.    Alice also believes it discovered that Rotchin has unlawfully disclosed details of early confidential Alice go-to-market business plans and website designs to Alice Partner 2 or its business associates.  Alice Partner 2 or its business associates appear to be using and publicly disclosing this information in violation of Alice's rights.

145.    As further evidence of Rotchin's ongoing misconduct, Rotchin recently attempted to poach a marketing executive consultant that Rotchin himself required to sign the Alice Standard NDA and Non-Compete Agreement.  Rotchin simply ignored the contractual obligation he put in place to unlawfully further his ongoing theft from Alice.

## COUNT I
**Breach Of Fiduciary Duty At Common Law And As Codified At MCL 450.4404**

146.    Alice incorporates all the above paragraphs as though fully set forth herein.

147.    By virtue of his role as Alice's most senior executive and *de facto* CEO, Rotchin owed fiduciary duties to Alice, including a duty of loyalty, a duty to act in the best interests of Alice, a duty of care, and a duty to act in good faith in all matters relating to his work for Alice.

148.    Rotchin breached his fiduciary duties and advanced his own interests to the detriment of Alice by, among other things (a) misappropriating Alice's actual and potential business relationship with Alice Partner 1, (b) misappropriating Alice's confidential information and trade secrets, (c) interfering with and misappropriating Alice's actual and potential business relationships with other Alice potential business partners and vendors, and (d) refusing to return Alice business assets and utilizing them to further his own interests.

149.    Rotchin breached his fiduciary duties and advanced his own interests to the detriment of Alice by covertly organizing Newco, a business intended to compete with Alice and steal Alice's business model, intellectual property, and partners, while still employed by Alice.

150.    Rotchin has breached his fiduciary duties owed to Alice in other manners yet to be discovered.

151.    As a direct and proximate result of Rotchin's breaches of his fiduciary duties, Alice has suffered and will continue to suffer damages in an amount to be determined at trial as well as irreparable harm.

152.    Rotchin's misconduct was knowing and willful, not in good faith, reasonable or prudent, and was in reckless disregard of Alice's rights, and was an intentional and wanton violation of Alice's rights.

## COUNT II
### Breach Of The Corporate Opportunity Doctrine at Common Law And As Codified At MCL 450.4409

153.    Alice incorporates all the above paragraphs as though fully set forth herein.

154.    Rotchin breached his fiduciary duties to Alice by usurping Alice's actual business relationship and business opportunity with Alice Partner 1.

155.    As a direct and proximate result of Rotchin's breaches of his fiduciary duties and usurpation of Alice's business opportunity with Alice Partner 1, Alice has suffered and will continue to suffer damages in an amount to be determined at trial as well as irreparable harm.

156.    Rotchin's misconduct was knowing and willful, not in good faith, reasonable or prudent, was in reckless disregard of Alice's rights, and was an intentional and wanton violation of Alice's rights.

## COUNT III
### Violation Of The Defend Trade Secrets Act, 18 U.S.C. § 1830, *et. seq*.

157.    Alice incorporates all the above paragraphs as though fully set forth herein.

158.    Alice owns and possesses certain confidential, proprietary, and trade secret information, as alleged above.  Examples of the trade secret information include, but are not limited to: (i) Alice's customers, prospective customers, email lists, customer data, pricing, marketing strategies, co-marketing partners, products and services; (ii) website designs and coffee selection algorithms; (iii) coffee taste and related marketing profiles; (iv) coffee grind type, size, and weight combinations and related total dissolved solids concentrations; (v) soft coffee bag closure designs and material specifications; and (vi) production machine designs, including the type of yarn and settings on the machines operated by Alice Partner 1 to create the appropriate amount to elasticity for the Alice soft coffee pods while allowing for high-speed manufacturing of the pods.

159.    Rotchin's knowledge of Alice's confidential, proprietary, and trade secret information was acquired by Rotchin under circumstances giving rise to a duty to maintain the secrecy or limit the use of this information, and it was acquired by Rotchin while he owed a duty to Alice to maintain the secrecy or limit the use of this information.

160. Alice's confidential, proprietary, and trade secret information relates to products and services used, sold, shipped and/or ordered in, or intended to be used, sold, shipped and/or ordered in, interstate or foreign commerce.

161. Alice has taken reasonable measures to keep such information secret and confidential.

162. Alice's confidential, proprietary, and trade secret information is not available to others to use through legitimate means.

163. Alice's confidential, proprietary and trade secret information derives independent economic value from not being generally known to, and not readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information.

164. In violation of Alice's rights, Rotchin misappropriated Alice's confidential, proprietary, and trade secret information in the improper and unlawful manner alleged herein. Rotchin's misappropriation of Alice's confidential, proprietary, and trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive. Rotchin has attempted and continue to attempt to conceal his misappropriation.

165. If Rotchin is not enjoined, he will continue to misappropriate and use Alice's trade secret information for this own benefit and to Alice's detriment.

166. If Rotchin is not enjoined, he will be unjustly enriched through this misappropriation and improper use of Alice's confidential, proprietary and trade secret information.

167. As a direct and proximate cause of Rotchin's misconduct, Alice has suffered and, if Rotchin's conduct is not stopped, will continue to suffer, severe competitive harm, irreparable

injury, and significant damages, in an amount to be proven at trial.  Because Alice's remedy at law is inadequate, Alice seeks, in addition to damages, injunctive relief to recover and protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests.

168.    Alice has no adequate remedy at law for Rotchin's misappropriation of its confidential, proprietary and trade secret information.

169.    Alice has been damaged by all of the foregoing and is entitled to an award of exemplary damages and attorneys' fees.

### COUNT IV
### Violation Of The Michigan Uniform Trade Secret Act, MCL § 445.1901, *et seq.*

170.    Alice incorporates all the above paragraphs as though fully set forth herein.

171.    As a result of Rotchin's actions, Alice has been and will continue to be injured and face irreparable injury.  Alice is threatened with losing the value of its trade secrets, goodwill, partners, customers, and income in amounts which may be impossible to determine, unless Rotchin is enjoined and restrained by order of this Court.

172.    Alice has no adequate remedy at law.

173.    As a result of Rotchin's actions, Alice has suffered damages in an amount to be determined at trial.  Because Alice's remedy at law is inadequate or incomplete, Alice seeks injunctive relief to recover and protect its property.  Because Rotchin's actions have been willful, malicious, outrageous, oppressive, or done in complete disregard of the consequences they might have upon Alice, the award of exemplary and punitive damages, as well as attorneys' fees, in an amount proven at trial is proper.

### COUNT V
### Tortious Interference With Business And Economic Expectancy

174.    Alice incorporates all the above paragraphs as though fully set forth herein.

175.     Rotchin falsely and fraudulently told Alice Partner 1 that Alice had exited the soft coffee pod business.

176.     At the time he made the above false and fraudulent statement to Alice Partner 1, Rotchin knew that his statement was false.

177.     Rotchin's false and fraudulent statement was made to induce Alice Partner 1 to execute a supply agreement with Rotchin and Newco instead of Alice.

178.     Rotchin's false and fraudulent statement caused Alice Partner 1 to sign an exclusive supply agreement with Newco instead of Alice, terminating Alice's ongoing relationship and expected exclusive contractual relationship with Alice Partner 1.

179.     As a result of Rotchin's actions, Alice has suffered damages in an amount to be determined at trial.  Because Alice's remedy at law is inadequate or incomplete, Alice seeks injunctive relief to recover and protect its property.  Because Rotchin's actions have been willful, malicious, outrageous, oppressive, or done in complete disregard of the consequences they might have upon Alice, the award of exemplary and punitive damages, as well as attorneys' fees, in an amount proven at trial is proper.

### COUNT VI
### Unjust Enrichment

180.     Alice incorporates all the above paragraphs as though fully set forth herein.

181.     As Alice's most senior executive and *de facto* CEO, Rotchin was entrusted with all of Alice's confidential, proprietary, and trade secret business information.

182.     Rotchin knew and understand every aspect of Alice's business, including its product designs, customers and prospective customers, email lists, customer data, pricing, marketing strategies, products and services, website designs and coffee selection algorithms, and production machine designs.

183.     Rotchin's knowledge of Alice's confidential, proprietary, and trade secret business information, is a tangible benefit that Rotchin received from Alice.

184.     Rotchin has unlawfully used the confidential, proprietary and trade secret business information that he received from Alice to steal Alice's business and unlawfully compete with Alice.

185.     Rotchin has received a tangible benefit from the money and confidential, proprietary, and trade secret business information that Rotchin received from Alice.

186.     It would be inequitable for Rotchin to steal and retain the benefits of Alice's confidential, proprietary, and trade secret business information.

187.     Rotchin has been unjustly enriched by his receipt, and wrongful misappropriation and misuse of Alice's confidential, proprietary and trade secret business information.

188.     Rotchin must restore Alice to the position it occupied prior to Rotchin's wrongful conduct and return to Alice all property and value that Rotchin has received from Alice.

<u>**COUNT VII**</u>
**Conversion, MCL § 600.2919a**

189.     Alice incorporates all the above paragraphs as though fully set forth herein.

190.     While Rotchin served as Alice's *de facto* CEO, Rotchin purchased the Alice URL on behalf of Alice.

191.     The Alice URL was purchased by Rotchin with Alice's approval and Alice paid all costs associated with the purchase of the Alice URL.

192.     Rotchin did not register the Alice URL in Alice's name.  Rather, Rotchin registered the Alice URL in his own name.

193.     When Alice terminated Rotchin's employment, Alice demanded that Rotchin return all of Alice's property in Rotchin's possession or control.

194.     Rotchin has refused to return any of Alice's confidential business documents. Rotchin has also not transferred ownership to Alice of the Alice URL and other URLs in Rotchin's possession, custody or control that belong to Alice.

195.     Rotchin has wrongfully asserted dominion and control over Alice's confidential business documents and URLs.

196.     Rotchin has converted Alice's confidential business documents and URLs to his own use.

197.     At the time of the conversion, Rotchin knew that the confidential business documents and URLs were the property of Alice.

198.     Alice has been damaged as a result of Rotchin's conversion of Alice's confidential business documents and URLs, and is entitled to recover three times the amount of actual damages sustained, plus costs and reasonable attorneys' fees.

199.     The actions of Rotchin as described above have caused, and unless restrained, will continue to cause, Alice severe, immediate, and irreparable injury and damages, for which Alice has no adequate remedy at law.

## <u>COUNT VIII</u>
### Declaratory Relief: Rotchin's Patent Assignment Is Valid And Binding

200.     Alice incorporates all the above paragraphs as though fully set forth herein.

201.     Rotchin expressly acknowledged in his assignment of his rights in and to the Alice patent application that the assignment was made "[i]n consideration of the premises hereof, and other good and valuable consideration, receipt of which is acknowledged[.]"

202.     Rotchin in fact received adequate consideration for his assignment of his rights in and to the Alice patent application and the inventions contained therein.

203.     Rotchin was not fraudulently induced to enter into the assignment.

204.     Rotchin's transfer of his rights in and to the Alice patent application is valid and binding on Rotchin.

## **PRAYER FOR RELIEF**

WHEREFORE, Alice respectfully requests the following relief:

205.     Judgment in Alice's favor and against Rotchin on all causes of action alleged herein;

206.     A declaration that Rotchin's assignment of his rights in and to the Alice patent application and all the inventions contained therein is valid and binding on Rotchin;

207.     For damages incurred by Alice as a result of Rotchin's wrongful conduct described herein in an amount to be further proven at trial;

208.     For injunctive relief preventing Rotchin from utilizing any of Alice's confidential, proprietary, and trade secret information and preventing Rotchin from soliciting and contracting with business partners and potential business partners of Alice;

209.     For treble damages incurred by Alice as a result of Rotchin's conversion of Alice's confidential business documents and URLs;

210.     For punitive damages;

211.     For restitution of all property and benefits received by Rotchin from Alice;

212.     For costs of suit incurred herein;

213.     For prejudgment interest;

214.     For attorneys' fees and costs; and

215.     For such other and further relief as the Court may deem to be just and proper.

Respectfully submitted,

Dated:  February 16, 2021

RHOADES McKEE PC
Attorneys for Plaintiff

By:*/s/Patrick E. Sweeney*
    Patrick E. Sweeney (P79822)
Business Address:
    55 Campau Avenue, N.W., Suite 300
    Grand Rapids, MI 49503
    Tel:  (616) 235-3500
    psweeney@rhoadesmckee.com

JENNER & BLOCK LLP
Attorneys for Plaintiff

    Andrew W. Vail (Ill. Bar #6279951)
    (*Admission pending in W.D. Mich*)
    Miriam J. Wayne (Ill. Bar #6330609)
    (*Admission pending in W.D. Mich*)
Business Address:
    353 North Clark Street
    Chicago, IL 60654-3456
    Tel:  (312) 222-9350
    Fax: (312) 527-0484
    Avail@jenner.com
    Mwayne@jenner.com

## VERIFICATION

Peter Krupp, under penalty of perjury, states that he is an owner and authorized representative of the Plaintiff in this matter, that he has personal knowledge of the allegations contained within this Complaint related to the actions of Plaintiff, that he has reviewed this Complaint, and that the allegations contained herein are true and accurate to the best of the undersigned's knowledge and belief.

Dated: February 16, 2021

*Peter Krupp*

Peter C. Krupp

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury for all causes of action, claims, or issues in this action that are triable as a matter of right to a jury.

Respectfully submitted,

Dated:  February 16, 2021

RHOADES McKEE PC
Attorneys for Plaintiff

By:*/s/Patrick E. Sweeney*
    Patrick E. Sweeney (P79822)
Business Address:
    55 Campau Avenue, N.W., Suite 300
    Grand Rapids, MI 49503
    Telephone:  (616) 235-3500
    psweeney@rhoadesmckee.com